OPINION OF THE COURT
Morton I. Willen, J.
The fundamental issue in this case is the determination of a father’s obligation to provide child support when his adolescent children refuse to see him.
There is no doubt that such obligation may be suspended when a former wife-custodian actively deprives the father of his visitation rights. Under section 241 of the Domestic Relations Law which does not apply in the instant matter because of the former wife’s remarriage, alimony may also be terminated. Other remedies exist as well, which will be discussed below.
Where the father’s conduct towards the children clearly is such that his acts render it inimical to their physical or emotional well-being, then the children’s refusal to see him does not excuse his obligation to support them.
There is a grey zone, however, where the children perceive their father with anger and resentment, do not wish to see him, and conflicting allegations are made as to the basis. When this occurs, typically either a petition for contempt or to enforce or vacate support or visitation or to make support and visitation mutually dependent, follows, *378 and a hearing held to determine the adequacy of the children’s reaction. If, for example, their refusal to have visitation is fueled by their mother’s hurts, old or new, and she is overtly or covertly undermining visitation, and the alleged conduct of the father is blown up to undeserved proportions, then the misalliance between mother and children rather than the father’s conduct is the root cause for nonvisitation and the courts will afford him relief.
Stated another way, if the acts of the father with the children are of such magnitude as to reasonably excuse their refusal to see him, then his obligation to support them will be enforced. Where on the other hand, resentment, the anticipated fallout of a defunct marriage, results in noncompliance with the duty of the custodial parent to foster and encourage a positive relationship between the children and noncustodial parent, our law quite properly provides a range of remedies, including change of custody, contempt, suspending child support or alimony where applicable, and making child support dependent upon visitation.
The courts must take especial care not to provide children as allies to either side when former spouses elect to continue litigation warfare.
This petition by the father seeks a finding of willful contempt against the mother and an order making support dependent upon visitation. The parties were married in 1960 and divorced in 1979. There are two children, Cathleen, 17, and Robert (Robbie), 16. A nonmerged separation agreement provided custody to the mother, alimony, support for the children, specified visitation (one full weekend and all remaining Sundays of the month), prompt disclosure of serious illness of the children, and mutual access to their medical and school records. Additionally the parties agreed to: “exert every reasonable effort to maintain free access and unhampered contact between the children and each of the parties and to foster a feeling of affection between the children and the other party. Neither party shall do anything which may estrange the children from the other party or injure the children’s opinion as to their mother or father or which may hamper the free and *379 natural development of the children’s love and respect for the other party.”
In previous litigation, following the recommendation of the Consultation Services Center, Cathleen was excused from compliance with visitation with her father while Robbie was compelled to continue. The father is currently paying child support of $120 per week ($60 per week per child), as a result of an order of this court on December 10, 1980.
At this time the father has not had visitation with either of the children for over two years, based he says, on the mother having turned his daughter against him, and as to his son, based on the mother’s wrongful removal of the boy to a Pennsylvania boarding school without the father’s consent nor even consultation with him. No serious refutation was made by the mother that her placing the son in the Pennsylvania school was clandestine and effectively deprived the father of agreed upon as well as court-ordered visitation.
The testimony adduced showed continuous efforts by the father to obtain visitation. There were a huge number of telephone calls which resulted in either the phone being hung up, or his being told the children were not home when they actually were there, or his being told to call back at a later time at which time no one was home and eventually total frustration when the mother obtained an unlisted telephone number. He attempted on a large number of occasions to go to the mother’s house and was denied visitation in each instance. In at least one instance he was told his son was not home while he was seen at an upstairs window. Additionally the police were called frequently by the mother upon very little pretext. The father sent many letters as well as birthday and Christmas cards to the children and these were returned to him, unopened, and on one occasion, the boy, Robbie, responded with a vitriolic hate letter.
The main thrust of the mother’s defense was that the decision to forego visitation was made by the children solely, despite her advice to the contrary. The testimony of the mother persuades the court that she is ambivalent *380 about fostering an appropriate father-child relationship, paying lip service to its virtue but covertly approving any negative reaction by the children to their father. On cross-examination the mother’s present husband indicated that the mother was partially responsible for the children’s refusal of visitation by her overreaction to her former husband, and the court so finds.
The incidents which the children allege sustain their decision not to see their father consist of Cathleen’s claim that her father demeaned her in front of her friends, that he was a phony, that he badgered her about her mother, that he asked her to live with him, that she resented his present wife and her teenage daughter. She claimed her father called her a “whore”, “bitch”, “stupid” and that she looked like a prostitute. She was criticized by him at age 14 for wearing too much make-up, for low grades in school and for going out with boys.
The father denied all of the name calling except that he admitted telling his daughter, “If that’s the way you feel, you can go to hell.” He stated that his former wife’s reaction to the children’s refusal to see him was illustrated by her statement to him in a telephone conversation, “I am glad you are getting it stuffed up your ass.” Notwithstanding all of Cathleen’s negativism she admitted that during a period of regular visitation with her father they went rollerskating, to the movies and even picnics. The father’s present wife also indicated that at one time there was discussion of Cathleen living with them and sharing a bedroom with her 16-year-old daughter. After hearing all the versions of what was said and done, the court is satisfied that the father was truthful, sincere and is not looking to avoid his support obligations. He emphatically denies calling Cathleen the names she attributes to him and the court believes him. He testified that if he is required to support the children but is unable to see them, that they would continue to regard him as “just money”. His present wife described him as a gentle person, who when angry says “Go to hell, or to hell with you”, but nothing worse, and that he is a caring father as well as stepfather to her daughter. He impressed the court substantially that way.
*381 Robbie’s version of his father’s wrongdoing consisted of his father allegedly hitting him with a strap, being called a “faggot” and being struck by his father. These incidents were sharply controverted, with the father, however, admitting the following. Once Robbie climbed up on the roof after being told not to and he was punished by being hit lightly with a strap. Clearly Robbie should not have climbed on the roof and clearly the father’s use of a strap was not the most sensible way of disciplining him. However no claim was made that the boy was hurt, or genuinely beaten. The incident of Robbie being struck was described by the father as Robbie having placed too much wood in a lighted wood stove. When the fire got too large, he pushed him away from the stove. This, the court finds, was appropriate. As to Robbie being called a “faggot” the father admitted that on two occasions he told Robbie that “you act like a queer” when Robbie told him he did not fight back when he was hit by another boy. Undoubtedly these remarks should never have been made, particularly to a boy of Robbie’s sensitivity. Robbie and Cathleen are adopted children and both of them know this. Robbie has asthma and many emotional problems for which he is receiving therapy. He has been a poor student in the past as well as a behavioral problem and he was asked not to return to a parochial school he had been attending. Lately he has been doing better with the assistance of psychotherapy. Some time after the litigants were divorced Robbie left his mother to live with his father but after one week elected to return to his mother. Since then he has refused visitation with his father, written vitriolic letters to him, returned his birthday and Christmas cards, and told his mother to tell his father he was not home when he called or came to see him. He testified that he did not speak to his father on the telephone while in school in Pennsylvania and persisted in his story even when confronted with irrefutable documentary evidence to the contrary. The proof showed Robbie to be inconsistent, manipulative and . troubled. Small wonder in view of his history of adoption, perceived perhaps as a rejection of him by his biological parents, plus a severe trauma in boyhood while at school that need not be discussed herein, and the divorce by his *382 parents, which he may again feel to be a rejection of him. Notwithstanding all of the foregoing Robbie and his father had a good relationship for a long time which his father wishes devoutly to continue. Giving Robbie the unilateral power to cut it off for all time strikes the court as beyond his best interests. Robbie is not always the clearest of persons in knowing what is best for him and the court feels that the father’s motive in this lawsuit is a most natural one, to establish and have as normal a parent-child relationship as is possible under all the troubled circumstances everyone has endured.
The children’s mother clearly is struggling with the sure knowledge that it would be good for the children to relate to their father and her own disdain for him. She is unable to get out of her own way, vacillating between encouraging such relations and approving the children’s rebellion. This, as much as anything else, the court finds, is the reason for the litigiousness of this couple.
The mother has not obeyed her obligations under the separation agreement to disclose serious illnesses of the children to the father, nor has she permitted the father to have access to the children’s school records. The removal of Robbie to an out-of-State school without consultation with the father was in total disregard of his rights of visitation.
Under the law established by a host of decisions in our State, “The father’s right to see his children is tied into his covenant to [pay] * * * for their support.” (Borax v Borax, 4 NY2d 113, 116; Duryea v Bliven, 122 NY 567; Muth v Wuest, 76 App Div 332; and to the same effect are the decisions in Goldner v Goldner, 284 App Div 961; and Abraham v Abraham, 28 AD2d 864.)
The record is entirely silent as to any “pressing concern” or “exceptional circumstances” to warrant the removal of Robbie to an out-of-State school under the doctrine established in Abraham v Abraham (supra), Strahl v Strahl (66 AD2d 571) and Denberg v Denberg (34 Misc 2d 980, 986).
While the court recognizes that Robbie’s needs were somewhat special, the court questions the necessity of such a distant placement by his mother. Nevertheless, the court justifiably surmises that Mr. F. would have encountered *383 the same visitation obstacles even if Robbie were attending a local New York school. Indeed, while the distance between the father and son may well have been substantial in terms of miles, there is even a greater distance with respect to attitudes and perceptions. The court finds no fault on the part of Mr. F. in this regard. The father’s conduct is well short of any forfeiture by him of his previous right of visitation. The court is obliged to encourage the visceral feeling of a parent to see his or her children.
Accordingly, the decision of the court is that Mr. F.’s support obligation shall be dependent upon his being afforded actual visitation with both of his children. A finding of contempt at this time would likely exacerbate the hostility of the litigants for each other and perhaps ill serves the goal of promoting a reconciliation between the father and children and the court declines, therefore, to make such finding.
Settle order specifying realistic visitation, telephone access and related matters in conformance with this decision.